KAREN A. OVERSTREET
Chief Bankruptcy Judge
United States Courthouse
700 Stewart St., Suite 6310
Seattle, WA 98101
206-370-5330

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| In re<br><br>KURT ERICKSON,<br><br>        Debtor.<br>_____<br><br>SWIFT TOOL COMPANY, INC.,<br>a Washington Corporation,<br><br>        Plaintiff.<br><br>V.<br><br>KURT ERICKSON,<br><br>        Defendant.<br>_____ | Chapter 7<br><br>Bankruptcy No. 05-17598<br><br>Adversary No. 05-01320<br><br>**MEMORANDUM DECISION**<br><br>**<u>NOT FOR PUBLICATION</u>** |

This matter came before me for trial on January 22 and 23, 2008. After hearing the evidence and oral argument I took the matter under advisement so that I could review more carefully the exhibits admitted at trial. This Memorandum Decision contains my findings of fact and conclusions of law for purposes of Bankruptcy Rule 7052. I have jurisdiction of this matter pursuant to 28 U.S.C. §§ 157 and 1334 and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

MEMORANDUM DECISION - 1

For the following reasons, I find that the plaintiff, Swift Tool Company, Inc. ("Swift"), is entitled to judgment against the defendant, Kurt Erickson ("Defendant"), in the amount of $9,029.64 plus prejudgment interest from May 1, 2001, and $500 (sanctions awarded by arbitrator). I further find that these amounts are nondischargeable pursuant to Bankruptcy Code § 523(a)(6).

## I. Procedural Introduction

Defendant filed a chapter 7 proceeding on June 13, 2005. Defendant received a discharge in the main case, which was closed on September 20, 2005. Swift timely filed this nondischargeability action seeking to prevent discharge of its claims against Defendant based upon Sections 523(a)(6) and 523(a)(4). Swift's claims under Section 523(a)(4) for embezzlement and larceny were dismissed by Judge Glover in an oral ruling on summary judgment on July 27, 2007. It does not appear, however, that an order was ever entered on his ruling.

On the first day of trial I dismissed Defendant's counterclaims against Swift on the grounds that they were compulsory counterclaims in the state court action and that Defendant waived them by failing to assert them in the state court. I also dismissed Defendant's harassment claim against Swift for lack of any allegations in support of that claim.

## II. Findings of Fact[1]

Swift is an industrial cutting and tooling company doing business in Washington. Swift is a family-owned business and at all times relevant to this proceeding it was owned and operated by

---

[1] The admitted facts in the parties' pretrial order at Docket No. 47 are incorporated herein by this reference.

MEMORANDUM DECISION - 2

brothers Steve and Larry Smith.  Defendant initially went to work for Swift in 1998 doing indexable tool repair and grinding.  He subsequently left to work for Ramco, a company owned by Terry Reinig, at which he also performed indexable tool repair.  Prior to December 1999, Swift outsourced most of its indexable tool work, but later decided to diversify and keep that work "in-house" when Defendant offered his services in that specialized business.  It is undisputed that Defendant is extremely skilled at indexable tool repair.

As a condition to employment, Swift required Defendant to enter into a Contract of Employment, Exhibit 1, which Defendant and Swift signed on December 15, 1999 (the "Employment Contract").  Attachment A to the Employment Contract documented Swift's agreement to pay Defendant an hourly wage of $18 in addition to certain commissions based upon the growth of the business.  Swift and Defendant understood that Swift intended to invest significant funds to purchase the indexable tool repair machinery and equipment necessary to bring this type of work in house to Swift.  The Employment Contract contained a noncompete clause which prohibited Defendant from entering into business or employment in competition with Swift's indexable tool business within a 50 mile radius of Swift and for two years after the termination of Defendant's Employment Contract.  Defendant also signed a Confidentiality Agreement dated December 15, 1999, which prohibited him from disclosing, other than in the course of his duties with Swift, information that Swift considered confidential, including without limitation its customer names and pricing information.  Ex. 2.

MEMORANDUM DECISION - 3

Defendant understood the terms of both the noncompete clause and the confidentiality provisions.

After hiring Defendant, Swift purchased the equipment and machinery necessary to conduct the indexable tool business and commenced advertising the availability of those services. Defendant commenced work for Swift in its Everett facility on January 2, 2000. Steve Smith testified that Swift's indexable tool repair business grew quickly during the six months after Defendant started work. Defendant was the foreman of Swift's Everett shop with supervisory authority over two to three other employees. Defendant had direct contact with Swift's customers whose work was sent to Everett. At some point in 2000, Steve Swift began to notice a decrease in the revenues being generated from Defendant's work in Everett. Specifically, Mr. Swift determined that the revenues were not at the level he would expect given the number of hours being worked by employees in Everett. Larry Swift testified that after Defendant was employed, the indexable tool repair business reached a high of $14,000 in monthly revenues and then fell to a low of $8,000 in monthly revenues.

Upon investigation, Swift learned that Defendant had formed his own company called Indexable Tool Repair ("ITR") in July of 2000. Ex. 8. There is no dispute that ITR's business was indexable tool repair, the same work Defendant was employed to do at Swift. *See, e.g,* Ex. 9. In the Pretrial Order, Defendant admitted that while he was an employee of Swift he was doing indexable tool repair work through ITR, billing for the work directly and keeping the revenue, but he denied that this work was for customers of Swift. Also in the Pretrial Order, Defendant

MEMORANDUM DECISION - 4

conceded that in doing ITR's work, he used machinery and supplies belonging to Swift. The evidence showed that he also used the services of another employee of Swift to perform ITR's work.

Swift presented substantial evidence that after Swift's normal business hours were over, Defendant had used Swift's Everett shop to engage in the tool repair business for ITR customers. Exhibit 9 tracks the use of Swift's business premises in the Everett facility where Defendant worked. Steve Smith testified that using records from the alarm company, he was able to document a minimum of 158.06 hours between January 1, 2001 and April 10, 2001 during which Defendant was in the Everett facility after clocking off of Swift's work time clock. Defendant admitted that he had taken on tool repair work for ITR after hours, but that he did not conduct that repair work at the Swift facility. However, he had no credible explanation for the unaccounted hours shown in Exhibit 9. I find that Defendant did use Swift premises to conduct some of the work for ITR and that he also had another Swift employee working on ITR projects during Swift working hours and on Swift's premises.

Defendant denies that he did any off-hour work for Swift customers. I find that he did in fact work for existing customers of Swift and for entities that would have become customers of Swift had Defendant not diverted the work to his own company. Defendant claimed that some of the customers of ITR, such as Aronson-Campbell Industrial Supply, Inc. ("Aronson") and E.F. Bailey Company ("Bailey"), were competitors and not customers of Swift. He testified that he had formed relationships with these entities prior to the time he worked at Swift. There is no evidence, however, that these customers would not have done business with

MEMORANDUM DECISION - 5

Swift other than Defendant's opinion. The goal of the Employment Contract was that Defendant would use his contacts with these businesses to bring them to Swift as customers. Instead of doing that, Defendant diverted the business for his own personal benefit.

Through discovery, Swift obtained numerous ITR invoices to various companies which document the work performed by Defendant for others while he was employed by Swift. *See* Ex. 29, Ex. 15 (Aronson invoices), Ex. 16 (E.F. Bailey), Ex. 18 (Vector), Ex. 19 (Pederson), Ex. 20 (Genie Industries), and Ex. 22 (Barton Machine). Attachment A to this Memorandum Decision lists all of the invoices I find to represent work performed by Defendant (or another employee of Swift at Defendant's direction) through ITR and without Swift's knowledge. The invoices represent total revenue paid to ITR of $20,521.93.[2] All of the invoices indicate that the services performed were the same as the kind of work performed by Defendant for Swift. While employed at Swift, Defendant never disclosed to Swift his business activities through ITR, never advised Swift of his use of Swift facilities and employees to conduct ITR's business, and never asked Swift for approval of these outside activities.

Defendant conceded that beginning in September of 2000 he was earning about $2,000 per month from Barton Machine for grinding a large quantity of carbine pins. *See* Ex. 22. He conceded that he used the services of another Swift employee to complete this work.

---

[2] Defendant claimed that he did not do the work described in a few of the Aronson invoices (or that he could not remember whether he did the work); however, I find his testimony was not credible. He was the sole proprietor of ITR and controlled its operations. He did not identify anyone else who could have done the work.

MEMORANDUM DECISION - 6

He claimed, however, that Swift had rejected this job for Barton Machine. Larry Swift's testimony, however, was more credible. Larry Swift testified that he quoted the price of this job for Barton and gave the quote to Defendant to pass on to Barton. He testified that Defendant later told him that Barton chose not to use Swift. I conclude that Swift would have obtained this work but for Defendant's diversion of the work to himself personally.

After discovering Defendant's outside business activities, Swift terminated Defendant's employment effective April 24, 2001. After that date, Defendant continued to conduct indexable tool repair through ITR. Consequently, on May 1, 2001, Swift commenced a lawsuit against Defendant in King County Superior Court for violation of the noncompete agreement in the Employment Contract. Ex. 3. The complaint alleged breach of contract, tortious interference with business relationships, misappropriation, violation of the Washington Uniform Trade Secrets Act and conversion. The complaint also sought an injunction preventing Defendant from soliciting clients of Swift and doing business in violation of the Employment Contract.

On May 18, 2001, the state court issued a Preliminary Injunction ("Preliminary Injunction") which enjoined Defendant from disclosing any confidential information concerning the business of Swift and prohibited him from engaging in any business activity in competition with Swift as an employee or owner within a 50 mile radius of Swift. The prohibition applied to grinding, manufacturing, sale or marketing of industrial tools and to the solicitation of any Swift customers. Ex. 25. On June 1, 2001, Defendant sold ITR's tools and equipment to Big R Manufacturing

MEMORANDUM DECISION - 7

("Big R"), a company that had been formed by Terry Reinig, Defendant's prior business associate, and Defendant went to work for Big R as an employee. Believing this to be in violation of the Preliminary Injunction, Swift brought a motion for contempt in the state court and on September 24, 2001, the state judge issued an order finding Defendant in contempt for willfully violating the terms of the Preliminary Injunction. The judge imposed sanctions of $500 on Defendant but did not set a deadline for the payment of that amount. The judge also amended the terms of the restraining order, however, to permit Defendant to work as an employee in the tool grinding and repair business. Ex. 4. The order provided:

> 2.1 Kurt Erickson is enjoined from owning, operating or having any status as an officer, director or proprietor in any company which engages in the same business activities as Swift Tool did (and still does), while Erickson was employed there. However, Kurt Erickson is not enjoined from working as an employee for a company that engages in the same business activities as Swift Tool did (and still does), while Erickson was employed there.

*Id.* The Preliminary Injunction, as amended, continued the requirement that Defendant not disclose any confidential business information of Swift and that he not solicit customers of Swift. *Id.*

On February 4, 2002, the state court ordered the parties to arbitrate their disputes pursuant to the terms of the Employment Contract. The arbitration was scheduled for June 19, 2005. Instead of attending the arbitration proceeding, however, Defendant sought counsel and filed bankruptcy the day of the arbitration. It is not clear from the evidence whether the arbitrator's award, which is Exhibit 28, was issued before or after the Defendant's

MEMORANDUM DECISION - 8

bankruptcy petition was filed.[3] When Defendant failed to appear at the arbitration, the arbitrator required Swift to put on proof of its claims and, at the conclusion of that presentation, awarded damages to Swift in the amount of $106,297.68, including principal of $43,820.80, prejudgment interest of $16,237.83, attorneys' fees of $35,575.00, costs of $7,374.05, and the arbitration fee of $3,290. Ex. 28.

In January of 2003, Defendant parted ways with Big R and went to work as an employee for Jirehtek to perform the same tool repair work as Defendant performed for Swift and then for Big R. Jirehtek formed Total Tool for the purpose of conducting indexable tool repair work. There is no evidence, however, that prior to April 24, 2003, when the noncompete provision in the Employment Contract expired, Defendant was an owner or operator of Big R, Jirehtek, or Total Tool. There was evidence that for about a month in September of 2003 Defendant was the sole operator of Total Tool because of a medical problem suffered by Total Tool's principal owner. Defendant ultimately acquired an 80% ownership interest in Total Tool.

Swift entered into evidence copies of invoices submitted to customers of Swift by Big R and Jirehtek/Total Tool for services performed by Defendant after he was terminated by Swift. *See* Exs. 15, 16, 17, and 20.

### III. Conclusions of Law

Based upon the foregoing findings of fact, the Court makes the following conclusions of law.

---

[3] The resolution of this disputed fact is not necessary, however, to my determination of the issues.

A.  Res Judicata and Collateral Estoppel.

Swift argues that collateral estoppel applies to the arbitrator's award of damages and that Defendant is therefore estopped to challenge the amount of damages awarded by the arbitrator. The resolution of this issue turns on whether an arbitration award which has not been reduced to judgment pursuant to the provisions of RCW 7.04A (Uniform Arbitration Act) has *res judicata* or collateral estoppel effect as would a judgment entered by the state court. I conclude that under Washington law an arbitration award that is not reduced to judgment does not have *res judicata* or collateral estoppel effect and in so concluding I adopt the reasoning of *Channel v. Channel*, 61 Wash. App. 295, 810 P.2d 67 (1991) (arbitration award not reduced to judgment does not have collateral estoppel effect). *See also Larsen v. Farmers Insur. Co.,* 80 Wash. App. 259, 909 P.2d 935 (1996)(construing Oregon law but finding it similar to Washington and following *Channel*). In so holding I necessarily reject the statement in *dicta* in *Dougherty v. Nationwide Ins. Co.*, 58 Wash.App. 843, 795 P.2d 166 (1990), that an arbitration award is akin to and has the same effect as a final judgment entered by a Washington state court.[4]

---

[4] At trial, Swift introduced Exhibit 27 as an itemization of the damages it presented to the arbitrator. That exhibit details $99,938.13 in damages, including prejudgment interest. The Arbitration Award, Exhibit 28, awards a total of $106,297.68 in damages to Swift, including principal damages of $43,820.80. After comparing Exhibit 27 and 28, I am not able to reconcile them and to determine how the arbitrator calculated the principal damages awarded.

MEMORANDUM DECISION - 10

B.  <u>Burden of Proof and the Elements of § 523(a)(6)</u>.

Section 523(a)(6) provides that "(a) A discharge under . . . this title does not discharge an individual debtor from any debt-...(6) for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Swift has the burden of proving by a preponderance of the evidence that Defendant's actions were "willful and malicious." *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

The determination of a "willful and malicious" injury requires a two-step analysis. *Khaligh v. Hadaegh (In re Khaligh)*, 338 B.R. 817, 831 (9th Cir. BAP 2006). The first step is to determine whether there was a "willful" injury, which "triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts." *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998). A willful injury is deliberate, and it is "one which, in fact, targets a particular individual for harm and in so doing, injures him." *Blandino v. Bradshaw (In re Bradshaw)*, 315 B.R. 875, 886 (Bankr. D. Nev. 2004). Thus, the willfulness test is subjective: "[Section] 523(a)(6)'s willful injury requirement is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct." *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002). *See also In re Jercich,* 238 F.3d 1202 (9th Cir. 2001)(court finds employer's willful failure to pay employee wages grounds for nondischarge under § 523(a)(6)).

The second step of the Section 523(a)(6) inquiry is to determine whether Defendant's conduct was "malicious." *Khaligh*, 338 B.R. at 831. To find "malicious" conduct the Court must find:

MEMORANDUM DECISION - 11

(1) a wrongful act on Defendant's part; (2) done intentionally; (3) which necessarily causes injury to Swift; and (4) which is done without just cause and excuse. *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1106 (9th Cir. 2005) (as amended). It can be inferred that a "willful" injury meets these requirements; in particular, "evidence in the record of specific intent to injure" negates just cause or excuse. *Khaligh*, 338 B.R. at 831.[5]

Unlawful conversion of property of another is not expressly included in Section 523(a)(6), however, it is acknowledged that the section also covers a willful and malicious conversion by its reference to injury to an "entity" or the "property of another entity." An "entity" includes a "person", which in turn includes a partnership or corporation. 11 U.S.C. §§ 101(15), 101(41). Although federal law determines the dischargeability of a debt, state law governs the elements of a conversion of personal property. Under Washington law, conversion is "the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it." *Washington State Bank v. Medalia Healthcare*, 96 Wn. App. 547, 554, 984 P.2d 1041 (1999).

C.  <u>Defendant's Conduct Prior to Termination</u>.

Based upon the above authorities, Swift has the burden of proving that Defendant intended to injure Swift through his competing business or that the injury to Swift was certain to occur

---

[5] In two pre-*Geiger* cases, courts found an intentional breach of an employment agreement and noncompete clause to give rise to nondischargeable damages under Section 523(a)(6). *See In re Trammell*, 172 B.R. 41 (Bankr. W.D. Ark. 1994); *In re Ketaner*, 149 B.R. 395 (Bankr. E.D. Va. 1992).

MEMORANDUM DECISION - 12

from his actions.  I find that Swift has met that burden as to the competing business Defendant conducted while still employed at Swift.  By creating his own sole proprietorship, ITR, to conduct the same tool repair business Defendant was supposed to be conducting as an employee of Swift, it was Defendant's intention to steal or convert some of that business from Swift.  Defendant's Employment Contract permitted him to "engage in other gainful occupation" during the term of his employment "with the written consent" of Swift.  Defendant knew the terms of the agreement.  If he believed he was *not* converting business and revenue from Swift he could easily have notified Swift that he wanted to take on extra work on his own time and obtained the written consent of Swift before proceeding.  Instead, Defendant did not inform Swift of his intention to do the work, worked after hours on Swift's property to do the work, and without Swift's knowledge, created his own company through which he could pass the revenue.

Defendant took business that initially came to him as an employee of Swift and diverted it for his own personal benefit. Swift argues that Defendant's diversion of business opportunities to himself would necessarily harm Swift and therefore Defendant acted with malice.  Defendant argues that as to the work done for Barton, it was work that Swift had rejected.  Counsel for Defendant engaged in a mathematical analysis to show that the Barton work would not have been of economic benefit to Swift had the work been conducted by Defendant while employed by Swift.  That analysis, however, ignores the contrary testimony from Steve Swift.  As to the other work diverted by Defendant (other than Barton), Defendant

MEMORANDUM DECISION - 13

offered up no excuse other than his desire to own his own business and be his own boss.

Defendant's diversion of business while an employee of Swift satisfies the definition of conversion and it was malicious because it was without just cause or excuse. According to my calculations, the revenues derived by ITR as a result of Defendant's unlawful conversion total $20,521.93. Paragraph 5 of the Employment Contract provides for liquidated damages in the amount of 25% of any revenues derived by any entity (ITR in this case) as a result of Defendant's breach of the agreement as an alternative to actual damages. Although the liquidated damages provision acknowledges that actual damages are difficult to calculate, I do not believe they were difficult to calculate under the circumstances of this case. Moreover, the undisputed testimony was that Swift's average profit margin over the last 15 years has been 44 to 45% of revenues. Using the contract rate of 25% of revenues would therefore reward Defendant for his malicious conversion of Swift's business. Accordingly, I find that Swift is entitled to 44% of $20,521.93, or a claim of $9,029.64 for unlawful conversion.

Swift also contends that Defendant should have nondischargeable liability for using Swift's employee discount to purchase tools from a third party and for converting a pair of $70 work gloves. I do not see how Swift was harmed by Defendant's use of the employee discount. Furthermore, I believe Defendant's testimony that workers in the Everett plant used many pairs of work gloves and I find no evidence that Defendant converted a particular pair.

MEMORANDUM DECISION - 14

D.  Defendant's Post-Termination Conduct.

After Defendant was terminated by Swift, he continued to compete with Swift for indexable tool repair through ITR. Shortly after the Preliminary Injunction was issued on May 18, 2001, however, Defendant sold his equipment to Big R and became an employee of that entity believing that he would not be thereafter violating the noncompete provision of the Employment Contract. Although he was incorrect about that, when the Preliminary Injunction was amended on September 24, 2001, the state judge did carve out a way for Defendant to continue to earn a living doing indexable tool repair as long as he did not own or operate a company in competition with Swift and as long as he did not directly solicit customers of Swift.

There is no evidence that after September 24, 2001 and before April 24, 2003 (when the noncompete expired by its own terms) Defendant was anything other than an employee of Big R and then of Jerehtek/Total Tool. There is no evidence that he directly solicited clients of Swift during this time period. Given Defendant's undisputed talent as an indexable tool repairman, it would not be surprising that Swift clients who had dealt with Defendant would follow him to his new employer. Based upon the facts presented, I find nothing malicious about Defendant's conduct after September 24, 2001 and prior to April 24, 2003. If Swift believed that Defendant was flaunting the state court's order by conducting business as an employee of Big R or Jerehtek/Total Tool, it could have sought further relief in state court. When the state court found Defendant in contempt of the initial injunction, the

MEMORANDUM DECISION - 15

judge ordered only $500 in sanctions. I will require the Defendant to pay that amount in addition to the damages identified above.

E. <u>Swift's Right to Legal Fees</u>.

Swift claims it is entitled to the legal fees and costs awarded by the arbitrator plus fees and costs incurred after the arbitrator's decision based upon paragraph 2 of the Arbitration Award which states that "The plaintiff is entitled to such further attorney's fees and costs as are incurred in seeking to collect this arbitration award." Ex. 28. In oral argument, counsel for Swift stated that fees and costs were awarded by the arbitrator pursuant to RCW 4.84.185 and RCW 7.21.030. Neither statute, however, is referenced in the arbitration award. There is no contractual right to attorneys' fees under the Employment Contract or the Confidentiality Agreement.

RCW 4.84.185 authorizes a state court to award attorneys' fees and costs to a prevailing party where the court makes written findings that the defense or claim asserted by the nonprevailing party was frivolous and advanced without reasonable cause. The court is to make its determination based upon a motion by the prevailing party after a voluntary or involuntary order of dismissal or final judgment after trial. There are no such findings contained in the Arbitration Award at issue here. Ex. 28.

RCW 7.21.030(3) permits a state court to order a person found in contempt of court to pay a party for any losses suffered by the party as a result of the contempt and any costs incurred in connection with the contempt, including reasonable attorneys' fees. There is no finding in the Arbitration Award, however, that Defendant was in contempt for failing to appear at the arbitration

MEMORANDUM DECISION - 16

and no indication by the arbitrator that the fees and costs awarded to Swift were pursuant to RCW 7.21.030.

There are two separate legal fee issues in this case: whether the legal fees and costs awarded in the arbitration to Swift are nondischargeable as a result of my ruling in favor of Swift on its Section 523(a)(6) claim, and whether Swift is entitled to recover its legal fees and costs incurred in prosecuting this nondischarge action. On the first issue, I conclude that Swift is not entitled to a nondischargeable claim for any portion of the legal fees and costs awarded it by the arbitrator. The Supreme Court has confirmed that in general, a creditor in bankruptcy is entitled to its legal fees and costs if there is a state law right to those fees and costs, *Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.*, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007). Having found that the Arbitration Award, without a confirming judgment, does not have *res judicata* effect, Swift must demonstrate some other state law authority for legal fees and costs. It has no contractual right to fees nor has it identified any statutory right under state or federal law.

As to the second issue, until the Supreme Court's recent decision in *Travelers*, *supra*, creditors could not recover attorneys' fees for litigating issues particular to bankruptcy law, such as nondischargeability issues. The Supreme Court in *Travelers* held that postpetition attorneys' fee are recoverable to the full extent of applicable non-bankruptcy law and that the Bankruptcy Code does not "disallow contract-based claims for attorney's fees based solely on the fact that the fees at issue were incurred litigating issues of bankruptcy law." 127 S.Ct. 1204. In this

MEMORANDUM DECISION - 17

case, however, there is no right to contractual attorneys' fees. Swift's only right to recover fees would be pursuant to the language of the Arbitration Award which is quoted above. Because I conclude, however, that the Arbitration Award does not have *res judicata* effect, it does not afford Swift a lawful right to the attorneys' fees incurred in litigating nondischarge issues.

For these reasons, I find that Swift is not entitled to a nondischargeable judgment for attorneys' fees and costs, other than the costs of this litigation which might be allowable under 28 U.S.C. § 1920 and Bankruptcy Rule 7054(b).

**Conclusion**

Counsel for Swift may submit an order and judgment consistent with this ruling. The judgement amount will be $9,029.64 in damages, plus prejudgment interest from May 1, 2001,[6] plus $500. The order should include a dismissal of Swift's claims under Bankruptcy Code § 523(a)(4) on summary judgment.

DATED this 13th day of February, 2008

_____
KAREN A. OVERSTREET
UNITED STATES BANKRUPTCY JUDGE

---

[6] Arguably, Swift is entitled to prejudgment interest from the date of each conversion of revenues by Defendant. For simplicity, I conclude that prejudgment interest should be awarded from the date that Swift made its demand for damages in state court by the filing of its complaint on May 1, 2001.

MEMORANDUM DECISION - 18

| Swift v. Erickson - Attachment A | | |
|---|---:|---:|
| ITR Invoice No. (Misc. Customers) | | Revenue |
| | 1025 | 21.72 |
| | 1026 | 51.9 |
| | 1027 | 73 |
| | 1028 | 87.45 |
| | 1029 | 85 |
| | 1030 | 358.38 |
| | 1031 | 86.88 |
| | 1032 | 200 |
| | 1033 | 26.94 |
| | 1034 | 2,200 |
| | 1036 | 115 |
| | 1038 | 537.57 |
| | 1039 | 685 |
| | 1041 | 2,200 |
| | 1042 | 644 |
| | 1043 | 288 |
| | 1045 | 115.47 |
| | 1046 | 390.96 |
| | 1047 | 2,200 |
| | 1048 | 188.15 |
| | 1050 | 98.83 |
| | 1051 | 513.68 |
| | 1052 | 110 |
| | 1054 | 110 |
| | 1055 | 616 |
| | 1056 | 2,200 |
| | 1057 | 242.45 |
| | 1058 | 704 |
| | 1059 | 65 |
| | 1060 | 47.92 |
| | 1062 | 390.96 |
| Total | | 15654.26 |
| Genie Invoices not in Ex. 29 from Ex. 20 | | |
| | 1003 | 173.25 |
| | 1002 | 224.7 |
| | 1004 | 194.25 |
| | 1020 | 586.44 |
| | 1009 | 570.15 |
| | 1008 | 211.77 |
| Total Genie from Ex. 20 | | 1960.56 |
| | | |
| Aronson invoices not in Ex. 29 from Ex. 15 | | |
| | 1006 | 42.35 |
| | 1005 | 145 |
| | 1007 | 245 |

|  | 1010 | 193.5 |
|---|---|---|
|  | 1012 | 100 |
|  | 1081 | 172 |
|  | 1011 | 157 |
|  | 1017 | 195 |
|  | 1016 | 55 |
|  | 1014 | 223 |
|  | 1013 | 369.25 |
|  | 1018 | 216 |
|  | 1019 | 214.5 |
|  | 1022 | 98.5 |
|  | 1023 | 115.5 |
|  | 1024 | 97.5 |
|  | 1037 | 55 |
|  | 1035 | 45 |
|  | 1040 | 39.51 |
|  | 1044 | 48.5 |
|  | 1053 | 80 |
| Total Aronson from Ex. 15 |  | 2907.11 |
| All Vector and Pederson included in Ex. 29 |  |  |
|  |  |  |
| Total all invoices |  | 20521.93 |
| Sequential missing invoices: |  |  |
| 1015, 1021, 1049, 1061, 1063-1080 |  |  |